02-12-122-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00122-CV

 

 


 
 
 Clinton
 Brunson, M.D.
  
  
 v.
  
  
 Ellvan
 Johnston
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 48th District Court
  
 of
 Tarrant County (48-253022-11)
  
 January
 17, 2013
  
 Opinion
 by Justice Gardner
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s order.  It is ordered that the order of the trial
court is affirmed.

It
is further ordered that appellant Clinton Brunson, M.D. shall pay all costs of
this appeal, for which let execution issue.

 

SECOND DISTRICT COURT OF APPEALS

 

 

 

By_________________________________

   
Justice Anne Gardner

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00122-CV

 

 


 
 
 Clinton Brunson, M.D.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Ellvan Johnston
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

FROM THE 48th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

 

In
this interlocutory appeal,[2] Appellant Clinton
Brunson, M.D. contends that the trial court abused its discretion by denying his
motion to dismiss the healthcare liability claim filed against him by Appellee
Ellvan Johnston.  Dr. Brunson asserts in one issue that the expert report by
Dr. Gary Lustgarten does not establish Dr. Lustgarten’s qualifications to
address the applicable standard of care or breach of the standard of care and that
the expert reports by Dr. Lustgarten and Dr. Philip Shalen do not adequately
set forth the required element of proximate cause.  We affirm.

II.  Background

 

Johnston
filed this lawsuit against Dr. Brunson and three other defendants in May 2011.  Johnston
alleged in his original petition that he was admitted to Presbyterian Hospital
of Rockwall on June 8, 2009.  The next day, Johnston could not move his left
leg.  Although Johnston was later able to move his leg, he underwent an MRI on
June 9, and Dr. Brunson carried out and interpreted the MRI scan and dictated a
report.  In the report, Dr. Brunson did not identify any abnormalities in
Johnston’s spinal cord.

Dr.
Michael Musacchio, a neurosurgeon, evaluated Johnston on June 11 because of
Johnston’s report of pain in his right hip and tail bone and difficulty in moving
his leg.  Dr. Musacchio also reviewed the June 9 MRI scan and likewise found no
abnormalities, but he recommended that Johnston be evaluated by a pain
management doctor.  Dr. Amit Darnule evaluated Johnston on June 12 but also did
not identify abnormalities on Johnston’s June 9 MRI scan.

On
June 13, Johnston exhibited escalating neurologic injuries in both lower
extremities.  He was unable to move either of his legs by June 14.  Dr. Ahmed
Elsehety was consulted and “identified findings suggestive of damage to
[Johnston’s] spinal cord at L1” and “abnormalities between T9 and the top of
L1.”  Johnston was transferred to the University of Texas Southwest Zale Lipshy
Hospital on June 18 and underwent surgery on June 19.  At the time of surgery,
“there was a spinal cord intradural hematoma from T9 to L2.”  Johnston alleged
that Dr. Brunson was negligent by failing “to reasonably identify abnormalities
in the MRI scan of June 9, 2009 in the L1 T12 region of the spinal cord” and by
failing to “provide reasonable treatment for those abnormalities.”

Johnston
served an expert report and curriculum vitae by Dr. Lustgarten along with his
original petition, and he subsequently served expert reports by Neal H.
Blauzvern, D.O. and Philip R. Shalen, M.D.  Dr. Brunson filed objections to the
reports by Drs. Lustgarten and Shalen.  The trial court overruled Dr. Brunson’s
objections after a hearing, and this interlocutory appeal followed.

III.  Standard of
Review and Statutory Requirements

 

A
trial court’s ruling concerning an expert report under civil practice and
remedies code section 74.351 is reviewable under the abuse of discretion
standard.  See Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2011);
Bowie Mem’l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002); Am. Transitional
Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001).  To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Cire
v. Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot
conclude that a trial court abused its discretion merely because the appellate
court would have ruled differently in the same circumstances.  Bowie Mem’l,
79 S.W.3d at 52; E.I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 558 (Tex. 1995).

A
health care liability claimant must serve an expert report on each defendant no
later than the 120th day after the claim is filed.  See Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(a).  A defendant may challenge the adequacy
of a report by filing a motion to dismiss, and the trial court must grant the
motion to dismiss if it finds after a hearing that “the report does not
represent an objective good faith effort to comply with the definition of an
expert report” in the statute.  Id. § 74.351(l).  While the expert
report “need not marshal all [of] the plaintiff’s proof,” Palacios, 46
S.W.3d at 878 (construing former article 4590i, § 13.01), it must provide
a fair summary of the expert’s opinions as to the “applicable standards of
care, the manner in which the care rendered by the physician or health care
provider failed to meet the standards, and the causal relationship between that
failure and the injury, harm, or damages claimed.”  Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(r)(6).

To
constitute a good faith effort, the report must discuss the standards of care,
breach, and causation with sufficient specificity (1) to inform the defendant
of the conduct the plaintiff has called into question and (2) to provide the
trial court with a basis to conclude that the claims have merit.  See Bowie
Mem’l, 79 S.W.3d at 52; Palacios, 46 S.W.3d at 879.  A report does
not fulfill this requirement if it merely states the expert’s conclusions or if
it omits any of the statutory requirements.  Bowie Mem’l, 79 S.W.3d at
52; Palacios, 46 S.W.3d at 879.  But the information in the report “does
not have to meet the same requirements as the evidence offered in a
summary-judgment proceeding or at trial.”  Palacios, 46 S.W.3d at 879.

When
reviewing the adequacy of a report, the only information relevant to the
inquiry is the information contained within the four corners of the document.  Bowie
Mem’l, 79 S.W.3d at 52; Palacios, 46 S.W.3d at 878.  This
requirement precludes a court from filling gaps in a report by drawing
inferences or guessing as to what the expert likely meant or intended.  See
Austin Heart, P.A. v. Webb, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no
pet.).  However, section 74.351 does not prohibit experts, as opposed to
courts, from making inferences based on medical history.  Marvin v. Fithian,
No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] July
1, 2008, no pet.) (mem. op.); see also Tex. R. Evid. 703 (providing that
an expert may draw inferences from the facts or data in a particular case);
Tex. R. Evid. 705 (providing that an expert may testify in terms of opinions
and inferences).

IV.  Expert Qualifications

 

Dr.
Brunson argues in the first part of his sole issue that Dr. Lustgarten’s expert
report and attached CV do not establish his qualifications to address the
applicable standard of care or breach of the standard of care.

To
be qualified, an expert must satisfy the requirements of section 74.401. See
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A).  Under section 74.401,
the expert must be a physician who:

(1) is practicing
medicine at the time such testimony is given or was practicing medicine at the
time the claim arose;

 

(2) has knowledge of
accepted standards of medical care for the diagnosis, care, or treatment of the
illness, injury, or condition involved in the claim; and

 

(3) is qualified on the basis of
training or experience to offer an expert opinion regarding those accepted
standards of medical care.

Id. §
74.401(a) (West 2011).

Dr.
Lustgarten’s expert report contains the following:

My qualifications to
render opinions as an expert witness . . . in this case are set out on my CV which
[is] attached.  In pertinent part I am a board certified neurological surgeon. 
I graduated from State University of Iowa College of Medicine in 1965.  I
served my internship at the New York Hospital/Cornell Medical Center in New
York City in 1965 through 1966.  I was flight surgeon for the United States Air
[F]orce between 1966 and 1968.  In 1968 I was accepted as a neurosurgical
resident at the University of Miami-Jackson Memorial Hospital School of
Medicine, Miami, Florida.  I completed my residency in 1973 and I’ve been in
private practice of neurosurgery since 1976.  I have been Board Certified [i]n
neurological surgeries since 1976.

 

. . . .

 

As a neurosurgeon
through my training, experience and education I have been thoroughly exposed to
neuroradiology as it pertains to interpretation of lumbar MRI scans of the type
performed on Mr. Johnston in this case on June 9, 2009. . . .  Interpretation
of a lumbar spine MRI is a skill that both a radiologist and a neurosurgeon are
expected to be able to perform with competence and accuracy to the degree with
which is necessary to identify the lesion at the T-12 through L-1 region as
identified on this scan.

 

As such, I am qualified to express an
opinion as to whether or not Dr. Brunson met the standard of care in
interpretation of the film performed on Mr. Johnston on June 9, 2009.  I am
familiar with the standard of care for Dr. Brunson and the circumstances
because both radiologist[s] like Dr. Brunson and neurosurgeons like myself have
the responsibility to accurately and competently interpret films of this type.

In
addition to listing various honors and awards that Dr. Lustgarten has received,
his CV states that he has been licensed in Florida from “1970 – Present,” that
he has been licensed in Maine from “2000 – Present,” and that he has served as
a “Florida Worker’s Compensation Certified Physician Expert Medical Advisor
(Examiner) – ‘EMA’” from “08/05/95 – Present.”  The CV also states that Dr.
Lustgarten is or was a “Senior Attending” at Jackson North Medical Center, but
the CV does not include a date-range or clarify whether that is a position Dr.
Lustgarten held in either 2009 or 2011.

Dr.
Brunson contends that Dr. Lustgarten is not qualified to offer opinions as to
the standard of care and breach of the standard of care because his expert
report and CV do not establish on their face that he “was actively practicing
medicine in rendering medical care services relevant to [Johnston]’s claim,
either at the time the claim arose [in 2009], or at the time he rendered the
opinion in his report [in 2011].”  Dr. Brunson further argues that although Dr.
Lustgarten’s report states that he has “been in [the] private practice of
neurosurgery since 1976,” the only employment listed during 2009 or 2011 is
“Expert Medical Advisor.”  Dr. Brunson argues that other statements in Dr.
Lustgarten’s report are conclusory and are therefore insufficient to establish
his qualifications.  In his reply brief, Dr. Brunson asserts that the
statements that Dr. Lustgarten “has been” board certified in neurological
surgeries and in the “private practice of neurosurgery” since 1976 and that Dr.
Lustgarten has been licensed in Florida from 1970 to the present and Maine from
2000 to the present do not establish that Dr. Lustgarten was actively practicing
medicine in 2009 or 2011.

We
decline to read Dr. Lustgarten’s CV and report so narrowly.  Dr. Lustgarten’s
report and CV expressly provide that he serves as a Florida Worker’s
Compensation Certified Physician Expert Medical Advisor and that he has been
licensed, board certified, and in the private practice of neurosurgery from
1976 to the present.  As to whether Dr. Lustgarten, a neurosurgeon, is
qualified to address the standard of care and alleged breach by Dr. Brunson, a
radiologist, Dr. Lustgarten’s report provides that he has been “thoroughly
exposed” to neuroradiology through his years of practice and that the
interpretation of an MRI scan like that involved in this case is common to both
neurosurgery and radiology.  We hold that, considered together in their
entirety, Dr. Lustgarten’s report and CV establish his qualifications to render
opinions in this case as to the applicable standard of care and alleged breach
of the standard of care by Dr. Brunson.  See Tex. Civ. Prac. & Rem.
Code Ann. § 74.401(a)(1) (expert must be “practicing medicine” at time of
testimony or at time claim arose); see also Moore v. Gatica, 269 S.W.3d
134, 140–41 (Tex. App.—Fort Worth 2008, pet. denied) (stating that certain
standards of medical care “apply to multiple schools of practice and any
medical doctor” and that a physician of another school of practice may be “competent
to testify if he has practical knowledge of what is usually and customarily
done by a practitioner under circumstances similar to those confronting the
defendant”).  We overrule this part of Dr. Brunson’s sole issue.

V.  Proximate Cause

 

In
the remainder of his sole issue, Dr. Brunson contends that the expert reports
by “Drs. Lustgarten and Shalen, taken together or separately, are legally insufficient”
because they include only conclusory and speculative statements of proximate
causation.

The
purpose of the expert report requirement is to inform the defendant of the
specific conduct the plaintiff has called into question and to provide a basis
for the trial court to conclude that the claims have merit.  Palacios,
46 S.W.3d at 879.  A report that merely states the expert’s conclusions about causation
does not fulfill these purposes.  Id.  Rather, the expert must explain
the basis of his statements to link his conclusions to the facts.  Bowie
Mem’l, 79 S.W.3d at 52.

A
plaintiff may meet the requirements of chapter 74 through multiple reports.  Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(i).  A single report need not “address
all liability and causation issues with respect to all physicians or health
care providers or with respect to both liability and causation issues for a
physician or health care provider.”  Id.  But read together, the reports
must provide a “fair summary” of the experts’ opinions.  Id. § 74.351(r)(6);
Barber v. Mercer, 303 S.W.3d 786, 791 (Tex. App.—Fort Worth 2009, no
pet.).

Relevant
to proximate cause, Dr. Lustgarten’s report states as follows:

On June 9, 2009[,]
Dr. Brunson breached the standard of care when he interpreted this film but
failed to identify the lesion at T-12 and L-1.  Dr. Brunson further failed to
meet the standard of care in fa[i]ling to identify the lesion, recommend
follow-up imaging including MRI scans of the thoracic and lumbar spine with and
without contrast and to make recommendation and/or direct referral to a
neurosurgeon to address the lesion.  It would have been acceptable in these
circumstances to either contact the patient’s admitting physician or if that
could not be accomplished immediately arranging emergency consultation with a
neurosurgeon for evaluation for surgery for removal of and/or exploration of
the lumbar and thoracic spine.

 

It is well understood
and documented in medicine that emergency decompression of the spine must be
accomplished within 12 hours of the onset of symptom.  If emergency
decompression of the spine is performed on those patients who have hematoma in
their spinal canal within the first 12 hours of symptoms more likely than not
such decompression will result in restoration of neurologic function and
stabilization of the patient to such a degree that they will no longer be
paraplegic.

 

. . .  Mr. Johnston’s
case records demonstrate that after the episode in which he was experiencing
loss of neurologic function to the left leg he had an episode of almost
complete resolution.  It was not until June 12, 2009 that he suffered findings
consistent with paraplegia that became permanent.  If Dr. Brunson had met the
standard of care then Mr. Johnston would have undergone emergency decompression
of the spine prior to the onset of permanent paraplegia three days later on
June 12, 2009.

 

Stated another way, the evolution of Mr. Johnston’s
symptoms created a circumstance whereby if Dr. Brunson had met the standard of
care appropriate surgical intervention could have been performed prior to the
onset of the catastrophic damages that occurred with new onset of symptoms on
June 12, 2009. . . .  This would have afforded Mr. Johnston with an opportunity
for definitive surgical correction of his problem and resolution of the mass on
his spinal cord before it ever reached the point of causing bilateral lower
extremity paralysis and paraplegia.

Dr.
Shalen’s report includes the following:

It is my opinion,
based on a reasonable degree of medical certainty that Dr. Brunson failed to
meet the reasonable, prudent and accepted standards of medical care for a
radiologist in the diagnosis, care and treatment of Mr. El[l]van Johnston by
failing to identify an obvious conus medullaris region abnormality visible o[n]
the MRI of June 9, 2009.  Compression of the conus was evident.  Conus
compression was most likely secondary to a hematoma.  This failure to diagnose
a conus abnormality deviates from the standard of care.  To comply with the
standard of care Dr. Brunson should have:  (1) carefully reviewed the
images of the MRI that showed the conus medullaris region abnormality; (2)
identified those abnormalities and (3) dictated a report describing those
abnormalities.  This would have allowed a timely recognition of the pathology
in Mr. Johnston’s spine.

 

Within reasonable probability, this deviation caused an
unreasonable delay in the clinical diagnosis and intervention of his
neurological condition.  The delay allowed his symptoms to increase to the
point of causing permanent neurological injury by ischemia to the spinal cord.

Considered
together, the Dr. Lustgarten and Dr. Shalen reports provide that, more likely
than not, a patient undergoing emergency decompression of the spine within
twelve hours of the onset of symptoms would have neurologic function restored
and would no longer be paraplegic; that Johnston showed signs of permanent
paraplegia on June 12, three days after Dr. Brunson performed and interpreted
the MRI scan; that Dr. Brunson’s failure to recognize the spinal condition and
recommend or obtain further evaluation or surgical intervention permitted
Johnston’s condition to worsen “to the point of causing permanent neurological
injury”; and that the delay deprived Johnston of the “opportunity for definitive
surgical correction of his problem and resolution of the mass on his spinal
cord” before it led to paraplegia.  In short, the expert reports provide that
had Dr. Brunson recognized the spinal abnormality, Johnston would have
undergone spinal decompression and had his neurologic function restored but
that Johnston did not receive the proper treatment for three days, a time at
which his neurologic injury had become permanent.

Dr.
Brunson argues that Dr. Lustgarten’s and Dr. Shalen’s causation opinions merely
“provide insight” into what caused Johnston’s paralysis but that they do not
link Dr. Brunson’s alleged breach of the standard of care to Johnston’s
injuries through specific facts.  He further argues that the reports are
lacking because the experts leave room to speculate as to whether there would
have been time to recognize the pathology of Johnston’s spine, whether the
other two physicians who evaluated Johnston would have agreed that surgery
should go forward, whether Johnston would have in fact undergone surgery, and
whether the surgery would have successfully prevented permanent paraplegia.  These
complaints relate, however, to inferences that expert witnesses are permitted
to make.  See Benish v. Grottie, 281 S.W.3d 184, 195 (Tex. App.—Fort Worth
2009, pet. denied) (contrasting experts’ ability to make inferences from facts
with prohibition against courts making inferences to determine if statutory
expert reports establish that claims have merit) (citing Tex. R. Evid. 703,
705); see also Weatherford Tex. Hosp. Co. v. Riley, No. 02-10-00453-CV,
2011 WL 2518920, at *4 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.)
(holding causation opinion in expert report sufficient because expert was
permitted to infer that physician would have performed cesarean section had
nurses discussed issues with the physician).

Rather
than attempting to create a list of hypothetical scenarios not addressed within
the expert reports, the questions we must answer are whether the Dr. Lustgarten
and Dr. Shalen reports provide a fair summary of the causal relationship
between Dr. Brunson’s alleged failure to meet the standard of care and
Johnston’s injuries and whether the reports adequately inform Dr. Brunson of
the specific conduct Johnston has called into question.  In that regard, the
reports at issue in this case are similar to the report held to be adequate in Eikenhorst
v. Wellbrock, No. 01-07-00459-CV, 2008 WL 2339735, at *2–3, 9–11 (Tex.
App.—Houston [1st Dist.] June 5, 2008, no pet.) (mem. op.).  There, the expert
opined that Dr. Eikenhorst’s failure to properly diagnose the injury and communicate
his CT scan findings caused a delay in treatment and aggravation of the
patient’s injuries.  Id. at *9.  The court held that the expert’s report
“did not only state that a delay in diagnosis caused permanent injuries; it
linked Eikenhorst’s specific conduct to a delay in diagnosis, leading to
increased and prolonged spinal pressure, resulting in [the patient]’s permanent
impairment.”  Id. at *10.  In this case, the reports assert that Dr.
Brunson failed to recognize the spinal abnormality and failed to arrange
further evaluation or surgical intervention for Johnston, the result of which
was a delay in treatment that led to permanent paralysis.  The reports, while
not lengthy, provide sufficient information and are not so conclusory or
speculative that they fail to satisfy Johnston’s statutory obligations.

We
hold that the reports by Dr. Lustgarten and Dr. Shalen gave the trial court a
sufficient basis to reasonably conclude that Johnston’s claims have merit and
advised Dr. Brunson of the conduct Johnston has called into question.  See Palacios,
46 S.W.3d at 875.  We overrule the remainder of Dr. Brunson’s sole issue.

VI.  Conclusion

 

Having overruled Dr.
Brunson’s sole issue, we affirm the trial court’s order.

 

 

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

 

DELIVERED:  January 17, 2013









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Civ. Prac. & Rem. Code
Ann. § 51.014(a)(9) (West Supp. 2012).